**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-4377

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

RHONDA NOTGRASS,

Defendant – Appellant.

No. 23-4378

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ROBERT NOTGRASS,

Defendant – Appellant.

Appeals from the United States District Court for the Southern District of West Virginia, at Charleston.  Irene C. Berger, District Judge.  (2:23-cr-00016-1; 2:23-cr-00017-1)

Argued:  September 24, 2024                          Decided:  February 27, 2025

Before KING and RICHARDSON, Circuit Judges, and William L. OSTEEN, Jr., United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge King and Judge Osteen joined.

**ARGUED:**  Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellants.  Alexander Allen Redmon, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.  **ON BRIEF:** Wesley P. Page, Federal Public Defender, Emily L. Szopinski, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia; Natalie Atkinson, THOMAS COMBS & SPANN PLLC, Charleston, West Virginia, for Appellants.  William S. Thompson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

RICHARDSON, Circuit Judge:

Rhonda and Robert Notgrass stole from American taxpayers when they fraudulently drew benefits from the Pandemic Unemployment Assistance program. Though it charged them with felonies, the Government let the Notgrasses plead guilty to misdemeanors, and the district court sentenced them to probation.

On appeal, the Notgrasses challenge four conditions set for their probation. But as part of their plea deal, the Notgrasses agreed to waive their right to appeal certain aspects of their sentence. So before tackling the merits, we face a threshold question: whether they can bring such a challenge at all. They can. The Notgrasses' appellate waiver covers only any sentence of imprisonment, fine, and term of supervised relief—not conditions of probation. So we reach the merits of their challenge.

On the merits, the Notgrasses argue that four probation conditions were both procedurally and substantively unreasonable. We reject both arguments. The district court adequately explained the conditions at sentencing in light of their objections, and the conditions were reasonably related to the § 3553(a) sentencing factors. We discern no abuse of discretion, and so we affirm the district court's sentence.

## I.    Background

The summer of 2020 was a trying time. Everyone responded differently as the COVID pandemic swept the nation: Some turned to baking; some turned to brewing; still others turned to crime. Robert Notgrass was a minister at the Lubeck Church of Christ in West Virginia. Rhonda Notgrass, his wife, was a congregant at the church.

When the pandemic hit, some churches across the nation closed or went bankrupt. But not the Lubeck Church of Christ. Although it cancelled services for a few weeks in the spring, the church stayed open—only it did so without Robert. The church relieved Robert of his duties in June 2020 for reasons not directly related to COVID-19. With unemployment looming ahead, a crushing student-debt load bearing down, and the pandemic roiling the job market, he and his wife panicked.

Then the Notgrasses spotted a way out: rendering Caesar's coin to themselves. *See Mark* 12:17. The national COVID-19 relief effort included a program called Pandemic Unemployment Assistance. This program provided benefits to replace wages lost "as a direct result of the pandemic." But since Robert was fired for reasons not directly related to the pandemic, and Rhonda hadn't lost her job, he and his wife were ineligible.

That didn't stop them. In August 2020, Robert allegedly filed a fraudulent application for pandemic benefits, falsely claiming that his unemployment was directly due to the pandemic. Rhonda filed her own fraudulent application, falsely claiming that she had been employed at the Lubeck Church before losing her job because of the pandemic. And since Robert was previously minister at the church, he falsely vouched for Rhonda's prior employment there. The ruse worked: The government accepted their applications and sent checks.

Their scheme, however, didn't go unnoticed. Someone reported the fraud later that month. The Department of Labor investigated, and federal charges were filed. Robert and Rhonda each pleaded guilty. Their plea agreements both contained the following appeal waiver:

4

> [Defendant] knowingly and voluntarily waives the right to seek appellate review of [his/her] conviction and of any *sentence of imprisonment, fine or term of supervised release* imposed by the District Court, or the *manner in which the sentence was determined*, on any ground whatsoever . . . so long as that *sentence of imprisonment, fine or term of supervised release* is below or within the Sentencing Guideline range corresponding to offense level 10, regardless of criminal history category.

J.A. 95; J.A. 105 (emphasis added).

The district court sentenced both Notgrasses to five-year terms of probation. Each was required to abide by the "standard terms and conditions of probation as recommended by the United States Sentencing Commission" as adopted by the court. They also were required to comply with the "standard conditions of supervision adopted by the Southern District of West Virginia and Local Rule of Criminal Procedure 32.3." J.A. 161; J.A. 191. On top of those standard conditions, the district court also imposed various "additional probation terms" and "special conditions of supervision" regulating their conduct. Their conditions were not identical. Instead, the district court modified them to suit Robert and Rhonda's individual circumstances.

The Notgrasses objected to four of the conditions. They jointly objected to two shared standard conditions: (1) a requirement they receive their probation officer's permission before leaving the judicial district in which they resided; and (2) a prohibition on possessing dangerous weapons. They also jointly objected to one of their "additional probation terms": (3) that they register with Workforce West Virginia, the state's unemployment agency, or an equivalent organization in the state where they lived. Finally, Robert objected to one of his unique "special conditions of supervision": (4) a requirement that he participate in a mental-health-treatment program monitored by his probation officer.

5

Against the first condition, both argued that they didn't pose a danger to others and so shouldn't be required to get permission before leaving the judicial district where they live. After hearing from counsel, the district court found the travel-permission condition "appropriate" and overruled their objections. J.A. 147; J.A. 174.

Both challenged the weapons prohibition (the second condition) on the grounds that they retained their constitutional right to defend themselves despite their misdemeanor convictions. But after reviewing the Notgrasses' presentence report, which detailed why the weapons bans were necessary, the district court overruled these objections too, finding that the conditions were "appropriate and not unduly restrictive of the defendant's rights." J.A. 147-48; *see also* J.A. 175. The court did, however, allow Rhonda to continue carrying pepper spray and mace, excepting these self-defense sprays from the general prohibition.

As for the third condition, the Notgrasses pointed out that they had moved back to Missouri and so shouldn't have to register with an unemployment agency in West Virginia. In response, the court modified the condition by directing them to register with the appropriate Missourian agency.

Last, Robert accepted the fourth condition's requirement to seek counselling but objected to his probation officer supervising the treatment. He argued that his care should be directed only by his current providers. The court determined the supervision requirement was "appropriate" despite the objection and clarified that it did not prohibit continuing his treatment plan with his current providers. J.A. 177.

The Notgrasses appealed.

6

## II.    Discussion

The Notgrasses gave away many of their rights when they pleaded guilty, and among these was their statutory right to appeal certain aspects of their punishment. But they didn't cede the right to challenge aspects of their probation. Still, their challenge to the conditions' procedural and substantive reasonableness fails on the merits. The district court adequately explained the Notgrasses' conditions in light of their objections and imposed a sentence that was reasonably related to the § 3553(a) sentencing factors. So we affirm.

### A.    The Appeal Waiver Does Not Cover Probation Conditions

We begin with the threshold question: whether the Notgrasses' appeal is barred by the valid appeal waiver in their plea agreement. Whether an issue falls within an appeal waiver is a question we review *de novo*. *See United States v. Carter*, 87 F.4th 217, 223–24 (4th Cir. 2023). If the appeal waiver covered the Notgrasses' challenges to their probation conditions, then we would stop here. We proceed because it does not.

A plea agreement is a contract. For this reason, we interpret it by reading the "plea agreement's plain language in its ordinary sense" to ensure that each party "receive[s] the benefit of their bargain." *United States v. Tate*, 845 F.3d 571, 575 (4th Cir. 2017) (quotation omitted). Both Notgrasses agreed they would not seek appellate review "of any sentence of imprisonment, fine or term of supervised release imposed by the District Court, or the manner in which the sentence was determined, on any ground whatsoever . . . so long as that sentence of imprisonment, fine or term of supervised release is below or within

the Sentencing Guideline range corresponding to offense level 10." J.A. 95; J.A. 105. Although this waiver sweeps broadly, it does not cover their probationary conditions.

The waiver has three parts. The first—"any sentence of imprisonment, fine or term of supervised release"—explains what types of sentences the waiver covers.[1] The second—"the manner in which the sentence was determined"—clarifies that the Notgrasses forfeit not just substantive challenges to those sentences but procedural ones too. And the last part—"so long as that sentence of imprisonment, fine or term of supervised release"—conditions the appellate waiver on the sentence of imprisonment not exceeding the advisory Guidelines range.

Read together, these three clauses cover just the three enumerated punishments— not probation. The first part of the waiver precludes challenges to "any sentence of imprisonment, fine or term of supervised release." The most natural reading of this part is that there are three—and only three—identified categories of punishments that the Notgrasses agreed not to challenge. In other words, the word "any" seemingly distributes to each item in the list: "any sentence of imprisonment, [any] fine[,] or [any] term of supervised release."[2]

---

[1] In other words, it describes what types of things the Notgrasses cannot appeal.

[2] There are other possible readings of this appellate waiver. One is that, rather than distributing the word "any" to each item in the list, the list might describe instances of "sentences." In other words, we might read the waiver's first element to apply to "any sentence of imprisonment," "any sentence of . . . fine," and "any sentence of . . . term of supervised release." But lacking an article (e.g., "a") the last two items in the list would become unnatural terms—we do not ordinarily use phrases like "sentence of . . . fine" or (Continued)

But notably, the first part of the waiver does *not* explicitly preclude challenges to terms of probation, a distinct punishment category separate from the three it lists. A probationary sentence is not a "sentence of imprisonment." Rather, probation is axiomatically *not* imprisonment; it is a substitute. *See* U.S.S.G. § 5B1.1(b), -(3) ("A sentence of probation may not be imposed in the event . . . the defendant is sentenced at the same time to a sentence of imprisonment for the same or a different offense."). Nor, quite obviously, is it a "fine." And it is also not a "term of supervised release." Probation is served in lieu of prison, while supervised release occurs after prison. *See* U.S.S.G. § 5D1.1 (explaining that a court "shall order a term of supervised release to follow imprisonment" in certain situations and "may order a term of supervised release to follow imprisonment in any other case").[3] On its face, then, the waiver doesn't cover probation.

The Government replies that even if *substantive* challenges to probation were excluded by clause one, the remaining parts of the waiver cover other challenges to probation. We disagree. The waiver's second clause bars challenges "to the manner in which the sentence was determined." This phrase only covers probation conditions if the terms of probation count as "the sentence" under the agreement. And they don't. At most, the agreement covers three types of punishment: prison, fines, and supervised release. Although part two expands the waiver's scope to cover procedural defects, not just

"sentence of . . . term of supervised release." But even if this reading were correct, it would not change the outcome because "sentence of probation" is still not one of the terms.

[3] Probation and supervised release should also not be confused with parole. Parole is early release from prison where a convict finishes out their term of imprisonment outside the jailhouse walls.

9

substantive ones, it does not expand the waiver to more types of punishment. Its reference to "*the* sentence" relates back to what the first clause enumerated, and probation is not included. The waiver's third clause gets the Government no further. It limits the defendants' ability to appeal "so long as that sentence of imprisonment, fine or term of supervised release is below or within [Sentencing Guidelines offense level 10]." Like the first clause, the third clause tells us what it reaches. And it uses the same list as the first clause, and probation isn't on it. And by reiterating clause one's limits, it also confirms that clause two—and thus the whole waiver—tracks those limits. So the best reading of the waiver is that it doesn't limit challenges to probation conditions.

Even if one could plausibly read the waiver to include probation conditions, we would decline to do so. Our precedent instructs that we construe any ambiguity in a plea agreement against the Government. *Tate*, 845 F.3d at 575 (citing *United States v. Barefoot*, 754 F.3d 226, 246 (4th Cir. 2014)). The Government may well have meant to cover probation conditions when drafting the waiver. Perhaps it even thought that the waiver did cover probation; as we explain below, probation and supervised release are often treated very similarly. But we look at what the plea agreement said, not what the Government meant for it to say. We will not do the Government's work for it by reading an omitted category into an enumerated list of meaningfully distinct terms. Although the Notgrasses agreed not to appeal many things, probations conditions were not one of them. We therefore proceed to the merits of the Notgrasses' challenge.

10

B.      **The District Court's Sentence Was Procedurally and Substantively Reasonable**

On the merits, the Notgrasses argue that four of their probation conditions are both procedurally and substantively unreasonable. On procedure, they claim that the district court inadequately explained the reasons for the conditions at their sentencing hearings in light of their objections. On substance, they say that the probation conditions were not "reasonably related" to the § 3553(a) sentencing factors. 18 U.S.C. § 3563(b). Both challenges fail.

We assess the Notgrasses' challenges to their conditions of probation under the familiar two-pronged procedural and substantive reasonableness standard that is applied to all sentencing appeals. *Gall v. United States*, 552 U.S. 38, 48, 51 (2007).[4] We first ensure that the district court did not commit procedural error—for instance, by "failing to adequately explain the chosen sentence." *Id.* at 51. We then "consider the substantive reasonableness of the sentence," *id.*, which, here, means that we check to see if the discretionary conditions imposed were "reasonably related" to the purposes of punishment

---

[4] Although *Gall* was a challenge to the sentence of probation generally, not to any particular condition of probation, this distinction makes no difference. A sentence includes all attached conditions. *See, e.g.*, *United States v. Arbaugh*, 951 F.3d 167, 178 (4th Cir. 2020). Indeed, *Gall* recognized that "[o]ffenders on probation are . . . subject to several standard conditions that substantially restrict their liberty" as well as "individual 'special conditions' imposed by the court." *Gall*, 552 U.S. at 48. In doing so, the Court referred to all of these conditions as part of the offender's "probationary sentence[]." *Id.*

As we just explained, probation and supervised release are meaningfully distinct from each other and from sentences of imprisonment. Yet because both are sentences, the principles governing their application and our appellate review of each apply to each other. Therefore, we draw from the post-*Gall* line of sentencing cases in our Circuit to evaluate the procedural and substantive reasonableness of these probation conditions.

11

laid out in the § 3553(a) sentencing factors. 18 U.S.C. § 3563(b). At both steps, we review the district court's actions under a deferential abuse-of-discretion standard, declining to "flyspeck[]" the district court's work out of respect for the "latitude" it has in sentencing determinations. *United States v. Mendoza-Mendoza*, 597 F.3d 212, 218–19 (4th Cir. 2010).

### 1. The district court adequately explained its probation conditions, and so the sentence is procedurally reasonable

There is no one-size-fits-all assessment of a district court's sentencing explanation. "The adequacy of the sentencing court's explanation depends on the complexity of each case." *United States v. Blue*, 877 F.3d 513, 518 (4th Cir. 2017). "The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances." *Rita v. United States*, 551 U.S. 338, 356 (2007). All the district court must do is provide "enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Id.*

This means that the district court need not give much explanation, if any, when imposing certain conditions of punishment. Conditions that are better understood as conceptually inherent to the punishment itself—being housed in a cell during a term of imprisonment, for example—require nothing beyond the general explanation for the choice of that punishment. Relatedly, for sentences of probation, a district court also need say nothing more about the "mandatory conditions" required by § 3563(a) to be imposed on every offender. *See United States v. Rogers*, 961 F.3d 291, 296–97 (4th Cir. 2020). Like conceptually inherent conditions, mandatory conditions "are, necessarily, part of any term

12

of [probation] pronounced at sentencing; the district court has no discretion to omit them." *Id.* In imposing them, the district court does not exercise "his own legal decisionmaking authority" and so needs no "reasoned basis" to do so. *Rita*, 551 U.S. at 356.

Some discretionary conditions, too, require little or no explicit explanation; sometimes "the court's reasoning, although not spelled out, [is] patently obvious." *United States v. Lewis*, 958 F.3d 240, 243 (4th Cir. 2020) (cleaned up) (quoting *United States v. Montes-Pineda*, 445 F.3d 375, 381 (4th Cir. 2006)). This is so when the reason for imposing the conditions is "so self-evident and unassailable" that the discretionary condition's reasonable relation to the § 3553(a) factors is easily discernable. *United States v. Amin*, 85 F.4th 727, 739 (4th Cir. 2023) (quoting *United States v. Elbaz*, 52 F.4th 593, 613 (4th Cir. 2022)). Otherwise put, though all discretionary conditions must rest on a "reasoned basis," the basis for many discretionary conditions can be straightforwardly gleaned "by examining the rationale for the sentence as a whole." *United States v. McMiller*, 954 F.3d 670, 676 (4th Cir. 2020) (quotation omitted).

This is particularly likely for the "standard conditions" recommended by the Sentencing Commission. *See* U.S.S.G. § 5B1.3(c) (standard conditions for probation); *id.* § 5D1.3(c) (standard conditions for supervised release). The "standard conditions" are so-named because they are sensible in almost every case where that form of sentence is imposed. For example: Few, if any, words are needed to explain why a defendant sentenced to probation must "report to the probation officer." *Id.* § 5B1.3(c)(2); *see also* 18 U.S.C. § 3563(b)(15) (same). Likewise, it's easy to see why a defendant must "notify the probation officer" of any later arrest. U.S.S.G. § 5B1.3(c)(9); *see also* 18 U.S.C.

13

§ 3563(b)(18) (same).  The bases for discretionary conditions like these may self-evidently follow from the reason why the court imposed probation in the first place.

By contrast, conditions that are "unusual" or "severe" will often require more explanation. *United States v. Armel*, 585 F.3d 182, 186 (4th Cir. 2009) (quotation omitted). More explanation will also be required when the defendant raises "nonfrivolous arguments" against aspects of the chosen sentence. *Blue*, 877 F.3d at 518.  The difference in the amount of explanation required is not because of a different standard—an "individualized assessment based on the particular facts of the case" is required for all sentences, *id.* (quotation omitted)—but because atypicality and nonfrivolous opposition could make discerning the district court's reasoned basis more difficult.  Yet even when reviewing unusual or severe conditions, we "may infer" the conditions' relation to the § 3553(a) factors "where the sentence imposed is explicitly tailored to address a defendant's individual characteristics." *Id.* at 521.  And we "may also infer that a sentencing court gave specific attention to" the defendant's opposing argument when the court "engages counsel in a discussion about" it. *Id.*

With these principles in mind, we turn to the Notgrasses' procedural-unreasonableness challenge.  They argue that the district court failed to adequately explain its reasoning when presented with specific objections to four conditions:  (1) that they obtain permission from their probation officer before leaving the judicial district in which they resided; (2) that they be prohibited from possessing dangerous weapons; and (3) that they register with the unemployment agency or an equivalent organization in the state where they lived.  Robert alone also alleges the same procedural defect attaches to the

14

condition that (4) his probation officer supervise his participation in a mental-health treatment program. Despite these challenges, all four conditions were imposed in a procedurally reasonable manner because the district court individually raised and adequately responded to each objection at the sentencing hearing.

The first two conditions are, notably, standard conditions recommended by the Sentencing Commission for all probation sentences. *See* U.S.S.G. § 5B1.3(c)(3), -(10). We are mindful that the standard conditions are statutorily discretionary and not imposed automatically. *See Rogers*, 961 F.3d at 297–98. But a thorough explanation of these two conditions is not always required. And though the district court's explanation was brief, it did enough to justify both.

On the travel-permission condition, the district court stated—in reply to a generic, conclusory objection from the Notgrasses—that it did not find the condition particularly severe since it would not prevent the Notgrasses from going anywhere; it just required them to check in to let the probation officer know of their whereabouts. The reason behind this condition is hard to miss: Probation works only if the probation officer knows where the probationer is.

The reasoning behind the weapons restriction was similarly clear. The district court—again, in response to a bare, unspecified objection—reiterated that the restriction was not unduly severe. And the sensible reason was again self-evident: As the presentencing report itself explained, weapons restrictions are necessary to ensure the safety of probation officers. It is especially apparent that the district court considered the specifics of the weapons restriction because it chose to narrow the restriction upon

15

Rhonda's objection to exclude self-defense items such as pepper spray and mace. The attention dedicated to these standard conditions is "enough to satisfy" us on review that the district court "considered the parties' arguments and has a reasoned basis" for imposing the conditions. *Rita*, 551 U.S. at 356.[5]

It is even easier to discern the reasoning behind the "additional" condition that both Notgrasses register with an unemployment agency in their resident state. In general, employment is beneficial because recidivism decreases when probationers provide for themselves and build social ties with coworkers. *See* Admin. Off. of the U.S. Cts., *Overview of Probation and Supervised Release Conditions* 29 (2024). That reasoning is particularly apt here given that the Notgrasses turned to crime because of financial difficulties in the wake of Robert's unemployment. This tailoring to the Notgrasses' "individual characteristics" allows us to infer an appropriate connection to the § 3553(a) factors. *Blue*, 877 F.3d at 521. What's more, the district court again signaled that it paid

---

[5] *United States v. Boyd*, 5 F.4th 550 (4th Cir. 2021), does not control this case. In *Boyd*, the court imposed a list of supervised-release conditions on every defendant, based in part on an assumption that they were "warranted in every case." *Id.* at 557–58. In the Notgrasses' case, though, the district court did not impose "special conditions . . . across broad categories of cases or defendants." *Id.* (quotation omitted). Instead, the sentencing judge reviewed the Notgrass' presentence report and imposed individually tailored conditions on their probations. That those tailored conditions happen to largely consist of the standard conditions recommended by the Sentencing Commission simply reflects the fact that the standard conditions are standard for a reason.

specific attention to this condition by accepting the Notgrasses' objection and modifying the state of registration from West Virginia to Missouri, their new state of residence.[6]

Finally, we are satisfied with the rationale for the "special" condition imposed on Robert to engage in supervised mental-health counseling. Unlike the other three conditions, this requirement is neither commonplace nor unintrusive, so we must "carefully scrutinize" the reasoning behind it. *Armel*, 585 F.3d at 186 (quotation omitted). Though we find no need to delve into detail, the record reflects that Robert would benefit from mental-health counseling, making this special condition again tailored to his "individual characteristics." *Blue*, 877 F.3d at 521.[7] True, Robert did not object to the counseling as a whole; he objected only to having his counseling supervised by his probation officer. But for one facing mental-health challenges, it is obvious why oversight would aid in regular compliance with appointments and treatment. The district court stated as much when it clarified in light of Robert's objection that it was "not making any comment on [Robert's]

---

[6] Robert objected specifically to registering with Workforce West Virginia while consenting to do so with an appropriate agency in Missouri. Rhonda generally objected to the condition because she "intend[ed] to remain residing in Missouri." J.A. 148. So both objections were to the location of, not the fact of, registration.

[7] This case is a far cry from *Lewis*, which reversed a district court's decision to impose an addiction-treatment program as a condition. 958 F.3d at 244. In *Lewis*, "the parties did not address, nor did the district court inquire [about], whether Lewis was addicted to controlled substances . . . [and, in fact] the probation officer stated in the PSR that Lewis denied 'ever drinking alcohol or using illicit substances.'" *Id.* Therefore, the "evidence suggest[ed] that" Lewis did "*not* need addiction treatment." *Id.* But here, Robert admitted needing treatment, his PSR stated that he had a history of mental-health problems, and the district court considered the fact that he was currently undergoing mental-health treatment.

current treatment or saying that that treatment [with his current providers] cannot continue" but only deciding that "the involvement of the probation officer is appropriate." J.A. 177.

We need no more detail to understand the district court's reasons for the four conditions. The court paid sufficient attention to each of the defendant's objections, modifying the conditions and providing exceptions where appropriate. So we are satisfied that the conditions were imposed in a procedurally reasonable manner.

## 2. The probation conditions satisfy the § 3553(a) factors and so are substantively reasonable

Because the district court's sentence was procedurally reasonable, we now assess whether it was substantively reasonable. To do so, we "take into account the totality of the circumstances" and assess whether the sentence as a whole—including any conditions—is justified by the § 3553(a) sentencing factors. *Gall*, 552 U.S. at 51. We review the district court's determination with "due deference" and will only reverse if we find an abuse of discretion. *Id.* We find no abuse of discretion here.

The Notgrasses were both nonviolent first-time offenders who accepted their responsibility. As a result, the applicable Sentencing Guidelines range, accurately reflected in the Government's presentence report, recommended zero to six months of imprisonment for both and encouraged the court to consider a sentence of probation instead. *See* U.S.S.G. § 5C1.1, cmt. nn.2 & 4. Adhering to the Guidelines' suggestion, the district court decided to sentence both Notgrasses to 60 months of probation in lieu of imprisonment. This sentence was the maximum within-range sentence of probation recommended by the Guidelines for the Notgrasses' offense levels. *Id.* § 5B1.2.

18

We have repeatedly stated that "sentences that fall within the Guidelines range are entitled to a presumption of substantive reasonableness." *Blue*, 877 F.3d at 519–20; *see also Gall*, 552 U.S. at 51 (permitting courts of appeals to apply such a presumption). Here, we have a challenge to the conditions of probation, not its length. But the reasoning that supports our presumption in favor of the Guidelines' recommendation for the *duration* of probation applies equally to the Guidelines' recommendation for the *conditions* of probation. So when the district court exercises its discretion and chooses to impose the "standard" conditions in § 5B1.3(c) of the Guidelines, we give such conditions a presumption of substantive reasonableness because the standard conditions are always "recommended for probation." We provide the same presumption for any imposition of a "special" condition from § 5B1.3(d) when the condition is recommended and applicable under the "circumstances described."

The Notgrasses fail to rebut the presumption of substantive reasonableness that attaches to the two standard conditions they challenge. The travel-permission condition and the weapons restriction, recommended for all probation sentences, appear eminently sensible and—in the case of Rhonda's pepper spray and mace carveout—appropriately tailored. We cannot say that the district court abused its discretion in imposing them.

The remaining two conditions are not precisely found in the standard or applicable special conditions recommended in the Guidelines and so are not presumed reasonable. But it is relevant in the totality of our consideration that both have close cousins in the Guidelines. The condition that both Notgrasses register with a Missouri unemployment agency is a more specific instance of the recommended standard condition that the

19

defendant "shall try to find full-time employment." U.S.S.G. § 5B1.3(c)(7). It, too, was appropriately tailored to the Notgrasses' new state of residence upon objection. And the condition that a probation officer supervise Robert's mental-health counselling is similar to the special condition that recommends "that the defendant participate in a mental health program approved by the United States Probation Office" when "the court has reason to believe that the defendant is in need of psychological or psychiatric treatment." *Id.* § 5B1.3(d)(5). In light of the Notgrasses' financially driven crime and Robert's admitted needed for mental-health treatment, we again cannot say that the district court abused its discretion in imposing such conditions.

Under the totality of the circumstances, all four conditions further the purposes set forth in § 3553(a) and are no more restrictive than necessary. We therefore find the conditions substantively reasonable under an abuse-of-discretion standard.

\*          \*          \*

The Notgrasses defrauded the Pandemic Unemployment Assistance program. They were caught and pleaded guilty, waiving their rights to challenge most aspects of their sentence—but not their conditions of probation. But the district court's conditions were procedurally and substantively reasonable, and we find no abuse of discretion. So the Notgrasses' challenges fail. The district court's sentences are

*AFFIRMED.*